**Molly C. SCHECTER, Appellant,**

v.

**MERCHANTS HOME DELIVERY, INC., Appellee.**

**No. 04–CV–1071.**

District of Columbia Court of Appeals.

Argued Dec. 13, 2005.
Decided Feb. 9, 2006.

---

Leslie Deak, with whom Ted J. Williams was on the brief, Washington, for appellant.

Michael P. Chervenak, Greenbelt, MD, for appellee.

Before SCHWELB, GLICKMAN, and KRAMER, Associate Judges.

SCHWELB, Associate Judge:

This action in tort was brought on October 11, 2002, by Molly C. Schecter against Circuit City, a retail chain which sells washing machines and other appliances, and Merchants Home Delivery (MHD), a company which arranges for the home delivery of Circuit City products. The suit was precipitated by events that occurred on February 8, 2000. On that date, on behalf of MHD, Alan Young, Jr., and Jason Brown delivered a new washing machine, which Mrs. Schecter had purchased from Circuit City, and they installed it in her home in Northwest, Washington, D.C. While at Mrs. Schecter's home, Young and Brown allegedly stole jewelry and other valuables.

At trial, Mrs. Schecter claimed that Young and Brown were employees of Circuit City and MHD, that the theft was committed by the two men while they were acting within the scope of their employment, and that both Circuit City and MHD were therefore vicariously liable for their employees' unlawful conduct. Mrs. Schecter also alleged that the defendants were directly liable for the negligent hiring, training, and supervision of Young and Brown. Circuit City and MHD contended that Young and Brown were not their employees, that Young was an "independent contractor," as provided in his written agreement with MHD, and that Brown was Young's helper and had no legal relationship with either defendant.

Beginning on July 19, 2004, the case was tried before a jury in the Superior Court. At the conclusion of the plaintiff's case, both defendants moved for judgment as a matter of law (JMOL), each defendant contending, *inter alia*, that no impartial jury could reasonably find that Young and

Brown were the moving defendant's employees. The trial judge directed a verdict in favor of Circuit City, but denied MHD's motion. MHD renewed its motion after all of the evidence had been presented, and the judge granted judgment as a matter of law in MHD's favor, holding

1. that no employer-employee relationship between MHD and Young and Brown had been established;

2. that even if Young and Brown were MHD's employees, Young and Brown were not acting within the scope of their employment when they stole Mrs. Schecter's valuables; and

3. that because Young and Brown were not employees of MHD, Mrs. Schecter's claim of negligent supervision failed as a matter of law.

Viewing the record, as we must, in the light most favorable to Mrs. Schecter, we conclude that the question whether Young and Brown were employees of MHD should have been submitted to the jury. We agree with the trial judge, however, that as a matter of law, the two men were not acting within the scope of their employment when they misappropriated Mrs. Schecter's valuables. Finally, we conclude that the question whether MHD was negligent in its selection and supervision of its employees should have been submitted to the jury. Accordingly, we reverse the judgment and remand the case

for further proceedings consistent with this opinion.[1]

## I.

## FACTUAL BACKGROUND

A. *The theft and partial recovery of Mrs. Schecter's valuables.*

On February 8, 2000, Mrs. Schecter was eighty years old. A few days after the death of her husband in January of that year,[2] Mrs. Schecter's washing machine broke. On February 6, 2000, Mrs. Schecter purchased a new washing machine from the Circuit City store in Rockville, Maryland. At the time of purchase, Mrs. Schecter arranged with the Circuit City salesman to have the new washing machine delivered to her home in northwest Washington, D.C., and to have her old machine removed. The salesman told her that Circuit City would call her and schedule the delivery. The following day, a woman telephoned Mrs. Schecter, identified herself as representing Circuit City, and scheduled the delivery for the following afternoon. Mrs. Schecter testified that the woman said: "This is Circuit City calling, we're going to deliver your washing machine."

On February 8, 2000, two delivery men, later identified as Mr. Young and Mr. Brown, arrived at Mrs. Schecter's house on Juniper Street to install the new washing machine. The men told Mrs. Schecter

---

**1.** We think it appropriate to observe that if the trial judge had permitted these issues to go to the jury, and had then entered judgment notwithstanding the verdict, no remand would now be necessary, and the expenditure of considerable time and resources by the parties and the participants in any new trial would have been avoided. "If there is room for a difference of opinion, the wise course is for the trial judge to allow the case to go to the jury." *Corley v. BP Oil Corp.,* 402 A.2d 1258, 1263 (D.C.1979) (citing *Seganish v. District of Columbia Safeway Stores,* 132

U.S.App. D.C. 117, 122, 406 F.2d 653, 658 (1968)); *see also Bushong v. Park,* 837 A.2d 49, 54 (D.C.2003).

**2.** The theft of Mrs. Schecter's valuables came at a tragic time in her life. Her husband of fifty-nine years, Melvin Schecter, had died three weeks earlier. The Schecters had cared for their severely retarded son, Michael, then fifty-five, for all of his life. That task had now fallen on Mrs. Schecter alone.

that they were from Circuit City. The delivery men brought the washing machine into the house and carried it down to the basement. They told Mrs. Schecter that as soon as they had installed the new machine, they would show her how it worked. Mr. Young soon called Mrs. Schecter and asked her to come down to the basement. When Mrs. Schecter arrived, Mr. Young was completing the installation, and he proceeded to demonstrate the operation of the machine.

Mr. Young then began to remove the old washing machine from Mrs. Schecter's house. While he was doing so, the old machine apparently became jammed in the door leading out of the basement. Young asked Mrs. Schecter if she had a saw, and Mrs. Schecter suggested that he look in the kitchen cabinet while she searched for a saw in the basement. The search soon proved unnecessary, however, for Young was able to move the old machine out of the house. The two men then left with the old machine. They had been in Mrs. Schecter's home for approximately thirty minutes.

After Young and Brown had departed, Mrs. Schecter telephoned her daughter, Shirlee Blanken, who had previously arranged to take her grocery shopping. When Mrs. Blanken arrived a short time later, Mrs. Schecter checked her purse to make sure that she had her money and her shopping list. Finding no cash in her purse, Mrs. Schecter remarked that she "must be getting senile," and she went upstairs to get her money.

When Mrs. Schecter looked in her dresser drawer, she found the contents in disarray. She started searching for her jewelry, which she kept in her dresser drawers, and especially for two diamond rings. When she could not find the rings or her other jewelry, a now thoroughly alarmed Mrs. Schecter told her daughter that she had been robbed. Mrs. Blanken joined her mother in the search, but the two women were unable to find the rings. Additional valuables, which included, among other items, a necklace, pins, watches, and coins, were also missing, and Mrs. Schecter's money was also gone. Mrs. Blanken called her husband, William Blanken, and told him what had happened. She also called 911, and police officers promptly arrived to investigate.

On the following day, Mr. Blanken telephoned Circuit City on Mrs. Schecter's behalf, and he reported the theft. Mr. Blanken was advised by a Circuit City representative that MHD, not Circuit City, had delivered the washing machine to his mother-in-law's home. Mr. Blanken telephoned MHD, and he was referred to Paul Fritz, who was in charge of MHD's Circuit City account. Mr. Fritz informed Mr. Blanken that Alan Young was the driver who had delivered the washing machine, and he gave Mr. Blanken Mr. Young's telephone number. Fritz told Blanken that Young worked for MHD.[3]

Mr. Blanken then contacted Mr. Young, who agreed to meet him at Mr. Blanken's house. In what must surely have been a tense encounter, Blanken told Young that he would not press charges against him if Young returned the stolen items. Mr. Young had brought with him the less valuable stolen costume jewelry, as well as

---

**3.** According to MHD's brief on appeal, Blanken testified that "Fritz advised Blanken that Alan Young was the *independent contractor* who had made the delivery to [Mrs.] Schecter's home earlier that week." (Emphasis added.) This description of Mr. Blanken's testimony is inaccurate, and it conveys the impression that Mr. Fritz referred to Mr. Young as an independent contractor. According to Blanken, Fritz did not refer to Young as an independent contractor at all.

some coins. When Mr. Blanken determined that the diamond rings had not been returned, he asked Young where the rest of the missing valuables were. Young informed Blanken that Jason Brown had some of the stolen items, including the two diamond rings. Young also gave Blanken Brown's telephone number.

Continuing his investigation, Mr. Blanken next telephoned Jason Brown. He was unable to reach Jason Brown, but he spoke with Jason's father, James Brown. James Brown informed Mr. Blanken that he would speak to his son and contact Mr. Blanken the following day. The next day, Mrs. Lavinnia Brown, Jason Brown's mother, telephoned Mr. Blanken and told him that her son had stolen the two diamond rings and that Jason had pawned each at a different local pawnshop. Mrs. Brown then went to the two pawnshops, together with Mrs. Schecter and Mr. and Mrs. Blanken, and she redeemed the diamond rings and returned them to Mrs. Schecter. According to Mrs. Schecter, however, a number of other valuables, worth in excess of $3000, were never recovered.

B. *The relationship between Circuit City, MHD, and Young and Brown.*

When Mrs. Schecter purchased her new washing machine, she was dealing, so far as she was aware, solely with Circuit City. In fact, she testified that she selected Circuit City, in part, because the firm advertised that it—Circuit City—would deliver and install the new machine and remove the old one. Nothing in the record suggests that Mrs. Schecter chose to deal with MHD, or with Mr. Young or Mr. Brown,

or, indeed, that she had ever heard of any of the three. Ironically, however, any right that Mrs. Schecter may have to recover damages for a theft which occurred while, so far as she knew, Circuit City was installing a washing machine that Circuit City had sold her turns on the relationship between a different company—MHD—and the two delivery men whom, she believed, Circuit City had sent to install the machine.[4]

The relationship between Mr. Young and MHD was set forth in a contract entitled "Independent Truckman's Agreement." The agreement states that the parties "intend to create an independent contractor relationship and not an employer-employee relationship." The contract was signed by Mr. Young on behalf of his company, "Young's Trucking Mecca." The contract required Young to hire his own personnel, use his own truck and equipment, and provide a performance bond for himself and his employees. The agreement also provides that Mr. Young "shall be responsible for the payment of wages and social security and withholding taxes for any of his employees." Further, the contract states:

In performing services under this Agreement, Contractor [Young] will direct the operation of any equipment in all respects and will determine the means of performance including but not limited to such matters as choice of any routes, points of service of equipment, rest stops, and timing and scheduling of customer deliveries. The parties intend to create an independent contractor relationship and not an employer-employee relationship.[5]

4. As previously noted, the trial judge held that there was insufficient evidence to permit a jury to find that Young and Brown were employees of Circuit City. Mrs. Schecter did not appeal from the directed verdict in Circuit

City's favor, and Circuit City is no longer in the case.

5. It appears that Mrs. Schecter's attorney and Mr. Fritz both misunderstood this provision. At trial, the following exchange occurred:

There is evidence in the record, however, that suggests that while Mr. Young was an independent contractor in form, he may have been an employee in substance. The delivery drivers were hired in very much the same manner as employees are hired, and they were trained, monitored, and supervised very much as employees are trained, monitored, and supervised. Moreover, MHD exercised substantial control over the manner in which the delivery drivers performed their tasks.

Mr. Fritz testified that MHD retained delivery drivers by means of a recruiting department and through direct referrals. Fritz personally interviewed each prospective driver and decided whether or not the candidate should be "hired." [6] MHD performed a background check on each delivery driver who was hired, though not on the drivers' assistants. MHD claimed that the assistants, such as Jason Brown, were the driver's employees, not MHD's. MHD provided extensive training to its delivery drivers. According to Mr. Fritz, "[w]e would explain to them the ways of delivery process through Circuit City and what the rules and regulations were through their contract." Experienced delivery drivers spent a week with each new driver to instruct him on proper delivery procedures and methods.[7]

MHD also kept close track of the activities of the delivery drivers, evaluating each driver for the quality of performance and the number of deliveries made. Customers were surveyed to check on the performance of the drivers, and those whose work MHD considered unsatisfactory were not retained. According to Mr. Fritz, MHD would "put together the routes for the delivery drivers," although each driver had the right to ask that his route be changed if he did not consider the route feasible. The drivers were directed to call in every half-hour and report their location to MHD.[8] The progress of the drivers was monitored on tracking boards in the MHD office.

The delivery drivers were required to wear MHD uniforms. Jason Brown's mother testified that she had seen her son

---

Q. All right. Now correct me if I'm wrong, but under paragraph nine of the contract, *"Merchants Home Delivery* will direct operations of any equipment in all respects and will determine the means of performance, including, but not limited to, such matters as choice of any routes, points of service of equipment, rest stops, and timing and scheduling of customer deliveries"*; is that not true?
A. That's what it says in the contract, word for word.
(Emphasis added.)

6. Although Mr. Fritz asserted that each of the delivery drivers was an "independent contractor," he never demurred when counsel for Mrs. Schecter referred to Fritz and MHD as having "hired" drivers and as having decided whether or not a particular driver should be "hired."

7. MHD's control over the details of the delivery drivers' work was quite detailed. With regard to the delivery of washing machines, for example, the contract between Circuit City and MHD, with which the drivers were required to comply, provided:

> Washers will be removed from the carton, shipping blocks and straps will be removed, front and rear legs will be attached and the unit will be leveled in place. The drain hose will be connected [and] all hoses will be connected to the existing hot and cold water taps. Delivery personnel will run a short test cycle for the customer. If necessary, existing washers will be disconnected at the point of delivery.

> \* \* \* \* \* \*

> During winter months, washer will not be operated until the unit has warmed to room temperature.

8. According to Mr. Fritz, the purpose of this requirement was to enable MHD and Circuit City to respond to customers' queries as to the status of particular deliveries.

wearing such a uniform. MHD also controlled the paper work used by the drivers. Circuit City provided MHD with a delivery ticket each time that a driver made a delivery. The drivers had to turn in the tickets on the morning after the delivery of the merchandise, so that MHD could calculate their compensation. The practical consequence of this arrangement, as Mr. Fritz acknowledged, was that "the next morning, [the delivery drivers] came into the dock, loaded their trucks, went out and made their home deliveries for the rest of the day, and then we would see them the next morning." A fair inference from this acknowledgment is that most of the drivers worked for MHD on a daily basis, rather as employees might be expected to work.

The delivery drivers were paid by the delivery, and they received checks from MHD twice per month. The amount of payment was based on the number of deliveries and the distances travelled. MHD also retained the right to discharge its delivery drivers, without notice if the discharge was for cause, and on sixty-days notice without cause. After Young and Brown were suspected of stealing Mrs. Schecter's valuables, Young was "suspended" for sixty days. Mr. Fritz called the sixty-day period "probation." After having been placed on "probation" for sixty days, Mr. Young left MHD and made no further deliveries for the company.

## II.

### LEGAL ANALYSIS

A. *The standard of review.*

■ Mrs. Schecter's appeal is from the trial judge's order directing a verdict in MHD's favor; the court, in the words of Super. Ct. Civ. R. 50(a), granted judgment in favor of the defendant as a matter of law. The question whether the trial judge properly directed a verdict, and thus took the case away from the jury, is one of law. *Phillips v. District of Columbia,* 714 A.2d 768, 772 (D.C.1998). Accordingly, this court gives no deference to the trial judge's ruling, and our review of his order is *de novo.*

■ A trial court may grant judgment as a matter of law only where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Super. Ct. Civ. R. 50(a). "On motion for a directed verdict, the record must be viewed in the light most favorable to the non-moving party, and that party ... is entitled to the benefit of every reasonable inference from the evidence." *Washington Metro. Area Transit Auth. v. Jeanty,* 718 A.2d 172, 174 (D.C.1998); *see also Bauman v. Sragow,* 308 A.2d 243, 244 (D.C.1973) (per curiam). "As long as there is some evidence from which jurors could reasonably find the necessary elements, a trial judge must not grant a directed verdict." *Marshall v. District of Columbia,* 391 A.2d 1374, 1379 (D.C.1987); *see also Abebe v. Benitez,* 667 A.2d 834, 836 (D.C.1995). In ruling on a motion for judgment as a matter of law, the trial court "must take care to avoid weighing the evidence, passing on the credibility of witnesses or substituting its judgment for that of the jury." *Pazmino v. Washington Metro. Area Transit Auth.,* 638 A.2d 677, 678 (D.C.1994) (quoting *Vuitch v. Furr,* 482 A.2d 811, 814 (D.C.1984)). If, however, there is not sufficient evidence for a reasonable juror to find in the non-moving party's favor, then the trial court is obliged, as a matter of law, to direct a verdict for the moving party.

B. *Vicarious liability.*

■■ Whether one who performs work on behalf of another is an employee or an

independent contractor depends on the particular facts of each case. *Safeway Stores, Inc. v. Kelly,* 448 A.2d 856, 860 (D.C.1982); *accord, Beegle v. Rest. Mgmt. Inc.,* 679 A.2d 480 (D.C.1996); *LeGrand v. Ins. Co. of N. Am.,* 241 A.2d 734, 735 (D.C.1968).[9] In *Beegle,* we stated:

> In determining whether such a relationship exists, the following facts should be considered:
>
> > (1) the selection and engagement of the [alleged] servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer.
>
> [*Safeway Stores,* 448 A.2d at 860.] While no single factor is controlling, "the decisive test ... is whether the employer has *the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." Id.* (citations omitted) (emphasis added). In this context, the right to control means "the right to control an employee in the performance of a task and in its result, and not the actual exercise of control or supervision." *Id.* In analyzing an employer's right to control, we look to the actual relationship between the parties and the language of any agreement between them, if any. *District of Columbia v. Hampton,* 666 A.2d 30, 38 (D.C.1995).

*Id.* at 485 (emphasis added in *Beegle* ). Viewing the record, as we must, in the light most favorable to Mrs. Schecter, we conclude that notwithstanding the terminology used in the Independent Truckman's Agreement, an impartial jury could reasonably find that Mr.Young and Mr. Brown were both MHD's employees. We shall now assess the relationship between MHD and Young and Brown in terms of each of the five criteria articulated in *LeGrand, Safeway Stores,* and *Beegle.*[10]

*(1) The hiring of Mr. Young.*

Viewing the evidence in the light most favorable to Mrs. Schecter, an impartial juror might reasonably find (though he or she would not be compelled to find) that MHD hired Mr. Young very much as an employer hires an employee. Mr. Fritz, as we have seen, accepted the term "hired" as an appropriate description of the process, or at least failed to challenge the use of this theory by Mrs. Schecter's counsel. MHD recruited Young and other delivery drivers, Fritz interviewed Young, and MHD conducted a background check before completing the engagement of Young's services.

On the other hand, MHD and Mr. Young, the latter representing "Young's Trucking Mecca," signed a contract which specified that Young was an independent contractor and not an employee. The language of the agreement is not conclusive, *Giles v. Shell Oil Corp.,* 487 A.2d 610 (D.C.1985),[11] but it is a factor that is properly considered in the overall calculus. *Beegle,* 679 A.2d at 486 (citing *Hampton,* 666 A.2d at 38). Mr. Young's obligation

---

**9.** *LeGrand* is described in *Safeway Stores,* 448 A.2d at 860, as "the leading case in our jurisdiction."

**10.** This standard did not originate with our *Safeway Stores* decision. In *Dovell v. Arundel Supply Corp.,* 124 U.S.App.D.C. 89, 90–91, 361 F.2d 543, 544–45, *cert. denied,* 385 U.S. 841, 87 S.Ct. 93, 17 L.Ed.2d 74 (1966), the court applied a substantially identical test, relying principally on *Keitz v. Nat'l Paving & Contracting Co.,* 214 Md. 479, 134 A.2d 296, 301 (1957), and *Grace v. Magruder,* 80 U.S.App. D.C. 53, 55, 148 F.2d 679, 681 (1945).

**11.** "[T]he parties' actual relationship, in spite of contractual language, may be the conclusive factor." *Giles,* 487 A.2d at 613.

under the contract to furnish his own truck, equipment, and helpers, and to provide bonds for himself and his employees, tends to support, but does not compel acceptance of, MHD's position that Young was an independent contractor.

### (2) Payment of wages.

Mr. Young was not paid an hourly wage. Rather, he was paid by the delivery. On the other hand, he received payment twice a month from MHD, a practice which an impartial juror could reasonably find to be common in employer-employee relationships. Applying the appropriate standard, we conclude that, under all of the circumstances, the payment arrangement sheds little, if any, light on whether an employer-employee relationship existed between MHD and Young.

### (3) The power to discharge.

Paragraph 3 of the Independent Truckman's Agreement permitted unilateral termination of the contract by either party. In this respect, an impartial juror could reasonably find that the agreement was similar to an at-will employment contract, which may be terminated at any time by the employer or the employee. Thus MHD had the right to discharge Mr. Young, either for cause (which required no notice) or without cause (on sixty-days notice). While not conclusive, this arrangement, as MHD all but acknowledges in its brief, is some evidence of an employer-employee relationship. *See Safeway Stores*, 448 A.2d at 861.

As the unilateral termination provision played out following the theft of Mrs. Schecter's valuables, Mr. Fritz treated Mr. Young as an employee. Specifically, Fritz placed Young on probation, and he suspended him for sixty days. Although Mr. Fritz asserted that he had expressed himself imprecisely in using the terms "proba-

tion" and "suspension," an impartial jury could reasonably find the use of these terms by MHD's representative to be significant.

It is surely a matter of common knowledge that employers place employees on probation, or suspend employees, in order to discipline them for misconduct for unsatisfactory performance of their duties. The actions of Mr. Fritz after the theft of Mrs. Schecter's valuables, as well as his phraseology, arguably support an inference that MHD and Mr. Fritz viewed (and therefore treated) the delivery drivers as employees, not as independent contractors. At least, in our view, an impartial jury, applying the proper standard, could reasonably so find.

### (4) Whether the delivery drivers' work is part of MHD's regular business.

Mrs. Schecter contends that MHD "hired Mr. Young to do the work that was its principal line of business." We agree. It is undisputed that MHD was retained by Circuit City for the sole purpose of making home deliveries of appliances sold by Circuit City. Indeed, the company's name—Merchants Home Delivery—was obviously chosen to explain the company's business. The sole service that MHD performed for Circuit City was to make home deliveries. Mr. Young and Mr. Brown (and other delivery drivers and drivers' assistants) made the home deliveries for MHD. The work Young and Brown did for MHD was thus MHD's principal—indeed, its only—line of business.

MHD contends that its regular business "is not to deliver its clients' merchandise itself," but rather "to arrange for a system of independent truckmen to deliver the merchandise of its clients." In our view, this exalts form over substance to a degree that transcends reality. "[L]abels are not controlling . . . ," and "courts deal with the

substance rather than the form of transactions." *EDM & Assocs. v. GEM Cellular*, 597 A.2d 384, 387–88 (D.C.1991) (citation omitted). An impartial juror, viewing the record in the light most favorable to Mrs. Schecter, could reasonably agree with Mrs. Schecter's attorneys, on the basis of common experience, that "[c]ompanies do not typically contract out all of their main production to independent contractors; to do so renders them hollow shells." Further, according to plaintiff's counsel, "[t]his evidence creates the logical inference that [MHD]'s designating the delivery drivers as 'independent contractors' was really a sham to evade its responsibilities as an employer." Although this characterization may come across as somewhat pejorative, an impartial jury could, in our view, find it to be reasonably accurate.

(5) *Power to control the servant's conduct.*

Although the facts of record are largely undisputed, the parties are in emphatic disagreement as to whether the evidence supports Mrs. Schecter's position that MHD retained the authority to control the conduct of Mr. Young and that of Young's assistant, Jason Brown. We conclude that, notwithstanding the use of the "independent contractor" label, a jury could find significant evidence that MHD had (and indeed exercised) such authority.

The record reveals that, however the relationship was denominated, MHD effectively determined where Mr. Young and Mr. Brown would travel each day. It did so by deciding which route and which deliveries it would offer to Mr. Young. While MHD accommodated the delivery drivers' preferences as to routes and deliveries, it did not relinquish control over the routes. Delivery drivers were not offered a choice or selection of routes, nor were they given the opportunity to bid on a particular route, so that they had no control over the location of their deliveries.

MHD asserts that the delivery drivers had the right to decline any of the routes offered to them. Although this is a legitimate factor in determining whether an employer-employee relationship existed— an employee ordinarily cannot decline a task given to him by his employer—it is not conclusive. MHD's contract with Mr. Young states that, "[w]hen requested by [MHD], [Mr. Young] in a good and workmanlike manner *will* deliver consumer items for [MHD's] customers." (Emphasis added.) In other words, MHD retained the ultimate authority to specify which deliveries Young and Brown would make and where they would make them. The determinative factor is "the right to control an employee in the performance of a task and in its result, and not the actual exercise of control or supervision." *Safeway Stores*, 448 A.2d at 860.

MHD also controlled the time at which the delivery drivers began work each day. When offering a route to the driver, MHD informed him of the time when the merchandise had to leave the loading dock. Based on direction from Circuit City, MHD specified at what time the drivers had to make each delivery. The delivery drivers were required to deliver the merchandise within a specified delivery window.

Moreover, as we have previously noted, each driver was required to report his location to MHD every half-hour. Drivers were also required to call in at the beginning and end of each delivery stop. MHD kept track of each driver's location throughout the day, and measured his performance on the basis of the driver's ability to make deliveries on time. The corollary of this tracking was that MHD terminated drivers who failed to make timely deliveries.

MHD also controlled in some detail the manner in which a driver made each delivery. The contract between Circuit City and MHD specified exactly what was to be done upon delivery of each type of appliance. See, *e.g.*, note 7, *supra* (setting forth in detail the procedure to be used in delivering washing machines). Further, as we have seen, see pp. 9–10, *supra*, there is evidence on the basis of which a trier of fact could reasonably find that MHD's procedures were geared to insure that the delivery drivers worked for MHD on a daily basis.

Finally, MHD exercised control over the clothing that the delivery drivers wore. At Circuit City's direction, the drivers were required to wear MHD uniforms. An impartial juror could reasonably find that this requirement reflects a substantial limitation upon the independence of those who wished to make deliveries for MHD, and that it is consistent with their being servants or employees, rather than independent contractors. By requiring the drivers to wear MHD uniforms, MHD held the drivers out to be a part of MHD's operations. Accordingly, the requirement that delivery drivers wear MHD uniforms, analyzed under the appropriate standard, moves the calculus in Mrs. Schecter's favor.

-----

In light of the foregoing analysis, we conclude that, viewed in the light most favorable to Mrs. Schecter, the record would support a jury finding that Mr. Young was an employee of MHD. Because it is undisputed that Mr. Brown was an employee of Mr. Young, a reasonable jury could likewise find that he too was effectively under the control of, and employed by, MHD.

This conclusion is consistent with, and finds strong support in, the decision of the United States Court of Appeals for the District of Columbia Circuit, issued almost forty years ago, in *Dovell*, 124 U.S.App. D.C. at 90–91, 361 F.2d at 544–45. In that case, a pedestrian who was struck by a truck sued Arundel Supply Corporation, the employer of the driver, John Skouzes, relying on a theory of *respondeat superior*. The principal issue that divided the parties was whether Skouzes was an employee of Arundel or an independent contractor. Skouzes owned two dump trucks, and he was responsible for their maintenance and upkeep. Skouzes drove one truck himself, and he hired a second man to drive the other truck.

Skouzes' job for Arundel was to haul gravel from Arundel's work site and to deliver it to customers designated by Arundel. While Arundel told Skouzes where to deliver the gravel, Skouzes was free to select the route by which he traveled to the customer's place of business. Skouzes worked for Arundel on a regular basis, five or six days a week, but he was free to drive for other employers as well at times when Arundel did not need him; each day Arundel had a right of first refusal as to Skouzes' services.

Prior to Skouzes' departure to make a delivery, Arundel loaded the truck and measured the load. Arundel paid Skouzes on the basis of receipts which Skouzes received upon completing the delivery. Skouzes' was paid weekly, and his compensation was based on the tonnage he hauled and the distance he hauled it. The agreement between the parties was oral, and it could be terminated at any time by either party without notice.

Based on all of these facts, the Court of Appeals reversed the District Court's award of summary judgment in favor of Arundel. The court emphasized that

Skouzes was not brought in as a plumber, for example, to perform a function

unrelated to Arundel's supply business as such. His function was directly related to and essential to the supplying of gravel by Arundel to Arundel's customers.

124 U.S.App. D.C. at 91, 361 F.2d at 545. The court concluded that "a jury determination is required here, since this is a doubtful case even though a close one." 124 U.S.App. D.C. at 92, 361 F.2d at 546.

There are obvious differences between *Dovell* and the present case. On the one hand, there was no agreement in *Dovell* identifying Skouzes as an independent contractor rather than an employee. On the other hand, there was no indication that Skouzes had to wear an Arundel uniform, that he had to report in every half-hour, or that the mechanics of delivery were subject to precise instructions from Arundel. No two cases are alike, but we are satisfied that in this case, as in *Dovell*, it is for the jury to decide whether Young and Brown were employees of MHD.

## C. *Scope of employment.*

 In granting a directed verdict in MHD's favor, the trial judge ruled as a matter of law that Alan Young was an independent contractor, but that even if he was not, MHD could not be held vicariously liable because the thefts were not within the scope of the delivery men's employment. The judge based his ruling on his view that the thefts were not committed in furtherance of MHD's business. We agree with the judge's conclusion with respect to the "scope of employment" issue.

 "*Respondeat superior* is a doctrine of vicarious liability and allows the employer to be held liable for the acts of his employees committed within the scope of their employment." *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 29 (D.C.1979) (citations omitted) (hereinafter *Reddick*). The boundaries of the term "scope of employment" were well articulated almost a century ago in *Axman v. Washington Gaslight Co.*, 38 App. D.C. 150 (1912), as follows:

> [W]e conceive the true test in measuring the principal's responsibility, to be whether the act of the agent was done in the prosecution of the business either impliedly or expressly intrusted to the agent by the principal. If it was, the principal is responsible for the manner in which the agent executed his commission, even if he acted wantonly, recklessly, or against orders. He represented his principal, and what he did was for the benefit of his principal. If his recklessness or lack of judgment caused loss or damage, it is only just that the one who selected and commissioned him should be held accountable therefor. Of course, the *moment the agent turns aside from the business of the principal and commits an independent trespass, the principal is not liable. The agent is not then acting within the scope of his authority in the business of the principal, but in the furtherance of his own ends.*

*Id.* at 158 (emphasis added).

More recently, in *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 758 n. 8 (D.C. 2001), we quoted with approval Section 228 of the RESTATEMENT (SECOND) OF AGENCY (1958), which reads as follows:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> > (a) it is of the kind he is employed to perform;
> >
> > (b) it occurs substantially within the authorized time and space limits;
> >
> > (c) it is actuated, *at least in part*, by a purpose to serve the master; and
> >
> > (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

(Emphasis added in *Brown.*) The Restatement goes on to provide that "[a]n act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." *Id.* § 235. Further, "[i]t is the state of the servant's mind which is material. Its external manifestations are important only as evidence. Conduct is within the scope of employment only if the servant is actuated to some extent by an intent to serve his master." *Id.* § 235 cmt. a.

In conformity with these principles, we have stated that "[t]he employer will not be held liable for those willful acts, intended by the agent only to further his own interest, not done for the employer at all." *Reddick,* 398 A.2d at 31 (citations and internal quotation marks omitted); *accord, Hechinger Co. v. Johnson,* 761 A.2d 15, 24 (D.C.2000). Further, "when all reasonable triers of fact must conclude that the servant's act was independent of the master's business, *and solely for the servant's personal benefit,* then the issue becomes a question of law," *Reddick,* 398 A.2d at 32 (emphasis added), and the master is entitled to judgment.

In the present case, it cannot reasonably be disputed that the theft of Mrs. Schecter's valuables was effected solely for the benefit of Young and Brown (each of whom subsequently possessed some of the proceeds), and not at all for the benefit of MHD. The fact that the thieves were authorized to take away Mrs. Schecter's old washing machine, and even to search for her saw, has no rational relationship to their conduct in stealing her jewelry. The

theft by Mr. Young and Mr. Brown was not "actuated at least in part, by a purpose to serve the master." RESTATEMENT § 228(1)(c). Indeed, it was not merely "too little activated by a purpose to serve the master," *id.* § 228(2), it was not so actuated at all. In our view, no impartial jury could rationally find otherwise.

"[T]he courts have consistently held that employers were not liable where employees ... participated in the theft of property from a customer's home or business premises, because the employees did not act within the scope of their employment or in furtherance of their employer's business." *Phoebe Carter,* J.D., Annotation: *Employer's Liability for Assault, Theft, or Similar Intentional Wrong Committed at Home or Business of Customer,* 13 A.L.R. 5th 217 (1993 & Supp.2004). *See, e.g., Int'l Distrib. Corp. v. Hines,* 186 U.S.App. D.C. 305, 308, 569 F.2d 136, 139 (1977) ("It is clear that the thefts in this case were simply a personal adventure which did not spring from any purpose to serve the employer. Hence the District Court correctly refused to impose vicarious liability upon [the employer]") (internal quotation marks omitted); *Bremen State Bank v. Hartford Accident & Indem. Co.,* 427 F.2d 425, 428 (7th Cir.1970) (employee of moving company stole money while bank was being moved); "the employer is liable for the negligent, wilful, malicious or criminal acts of its employees when such acts are committed during the course of employment and in furtherance of the business of the employer; *but when the act is committed solely for the benefit of the employee, the employer is not liable to the injured third party*" (emphasis added; citations omitted); *Effort Enters., Inc. v. Crosta,* 194 Ga.App. 666, 391 S.E.2d 477, 479–80 (1990) (defendant moving company's employer allegedly stole homeowners' jewelry; moving company

entitled to summary judgment, because "[a]s the only business of the [moving company] was to move the customer's belongings, any action by its employee in stealing jewelry would be personal and outside the scope of employment") (citation, brackets, and ellipsis omitted); *Searle v. Parke*, 68 N.H. 311, 34 A. 744 (1895) (defendants who were decorating state building, hired B and S to assist then; B or S stole a ring, "[t]heft was not the business for which B and S were engaged, nor was it within the scope of their employment. The mere fact that the wrongdoers were their servants is not sufficient to make the defendants answerable for the wrong."); *Island Assoc. Coop., Inc. v. Hartmann*, 118 A.D.2d 830, 500 N.Y.S.2d 315, 316 (1986) (employee removed inventory from customer's warehouse; employer held not liable because employee's actions were in no way incidental to furtherance of the employer's interest, and torts committed for personal motives, unrelated to furtherance of the employer's business, cannot be within the scope of his employment, especially if the tortious act is serious in nature) (citations omitted); *Liggett v. Glen Oaks Club, Inc.*, 28 N.Y.S.2d 84 (1941) (per curiam) ("Even if the defendant's employee could be held to have taken the articles, an employer not personally at fault is not liable for an employee's theft.").

The parties have cited us to no decision, and we know of none, holding that a theft by an employee, made to enrich himself, was committed within the scope of his employment. Mrs. Schecter relies on *Presley v. Commercial Credit Corp.*, 177 A.2d 916 (D.C.1962), but *Presley* does not provide significant support for her position. In that case, the plaintiff claimed that Robinette, an employee of the defendant creditor, drove away with the plaintiff's automobile, apparently mistaking it for a vehicle belonging to the plaintiff's brother, who was delinquent in his car payments to the defendant. The vehicle was found on the next day, stripped of various accessories and other personal property. Reversing a directed verdict in favor of the employer, the court held that a corporation may be held liable for the tortious acts of its employee when such acts are done within the scope of the employee's employment. *Id.* at 918. The court continued:

> Applying the above legal principles to the testimony in the present case, it seems reasonable that a jury might find that appellee's servant who was seen at the place and drove appellant's car away had some authority to protect the only security for the debt that the master had and to take away any automobile whose owner was delinquent in his payments. The jury could find that in doing so the servant Robinette was acting within the scope of his employment at the time and place and in furtherance of his master's business, even though in performing his duties he made a mistake and took the wrong automobile. In any event, although the evidence as to scope of employment was circumstantial, nevertheless, with reasonable inferences therefrom, the testimony made out a *prima facie* case requiring the defendant to present any evidence on its behalf and submission of the issues of fact to the jury.

*Id.*

Counsel for Mrs. Schecter claims that this decision stands for the proposition that Robinette's alleged theft of the accessories and personal property in the vehicle, even if it was done solely for his own benefit, could reasonably be found to be within the scope of his employment. Fairly read, however, the opinion holds only that the employee's alleged repossession of the wrong automobile did not necessarily

take his conduct outside the scope of his employment. In its opinion, the court did not address at all the legal consequences of the theft of the car's contents; it simply mentioned that the contents were stolen.

■ "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925); *see also District of Columbia v. Sierra Club,* 670 A.2d 354, 360 (D.C. 1996) (quoting *Webster*). In the absence of some more explicit discussion of the issue in the court's opinion in *Presley,* we are not prepared to treat that decision as holding by implication, without analysis, that a deliberate theft in a thief's own interest can be within the scope of his employment. Moreover, the *Presley* case is distinguishable from the situation before us, for Robinette, if he took the contents of the car, may have believed that he should do so on behalf of his employer so that the employer would have additional security to satisfy the car owner's supposed debt. In other words, if Robinette stole the car and its contents, an impartial jury might reasonably find that he did so, at least in part, for his employer's benefit. In the present case, on the other hand, it would be absurd to suggest that Mrs. Schecter's valuables were stolen by Mr. Young and Mr. Brown in order to enrich MHD. Here, the theft was incontestably for the thieves' own benefit, and Mrs. Schecter has not argued to the contrary

Mrs. Schecter relies on several decisions in which an employee, having become involved, within the scope of his employment, in an argument or altercation with a plaintiff, used patently excessive force against that plaintiff. These decisions are not easy to reconcile with one another. *Compare Johnson v. Weinberg,* 434 A.2d 404, 408–09 (D.C.1981) (laundromat employee shot and wounded plaintiff who had complained that his shirts were missing; summary judgment in favor of laundromat owner reversed); *Weinberg v. Johnson,* 518 A.2d 985 (D.C.1986) (judgment for $2,000,000 in favor of plaintiff in *Johnson v. Weinberg* affirmed); *and Lyon v. Carey,* 174 U.S.App. D.C. 422, 424, 533 F.2d 649, 651 (1976) (reversing judgment for employer notwithstanding the verdict where employee, who was delivering a mattress to a customer's home, raped the customer following an argument about whether the mattress should be brought upstairs and whether payment should be by check or cash; "[a]lthough the assault was perhaps at the outer bounds of *respondeat superior,* the case was properly one for the jury"); *with Boykin v. District of Columbia,* 484 A.2d 560, 562–64 (D.C.1984) (affirming summary judgment in favor of District where blind coordinator of an educational program sexually assaulted blind and deaf student while training her not to walk into obstacles; the court stated that *Johnson v. Weinberg* "approaches the outer limits of liability that may be imposed under *respondeat superior,*" *id.* at 563); *Grimes v. B.F. Saul Co.,* 60 App. D.C. 47, 48, 47 F.2d 409, 410 (1931) (holding that the owner of an apartment building was not liable for the attempted rape of a tenant by an employee who was inspecting the building for needed repairs; although the employee obtained access to the tenant's unit by professing to need to inspect it, the wrongful act was not done in the furtherance of the employee's business, but was an independent trespass on the part of the employee). Without attempting a reconciliation of these authorities, we note that each case in which the plaintiff prevailed originated in a job-related quarrel between the employee and the plaintiff, and the employer was held liable, although that quarrel did not justify the criminal

conduct of the employee thereafter. In the present case, there was no confrontation of any kind between Mrs. Schecter and the thieves. We are not prepared to extend the holdings of *Johnson* and *Lyon* to impose vicarious liability on the employer of a thief, where the thief has committed a theft solely for his own benefit.

In *Boykin*, the plaintiff argued that a deaf, blind and mute child can be taught only through the sense of touch, that physical touching was therefore a part of the teacher-student relationship, and that this made it possible for the sexual assaults to occur. We rejected this connection as "too attenuated." 484 A.2d at 562. For essentially the same reason, we consider "too attenuated" the connection proposed by counsel for Mrs. Schecter between the plaintiff's authorization to Young and Brown to remove the old washing machine and to search for a saw, and the wholly unrelated and criminal theft of Mrs. Schecter's valuables.

For all of the foregoing reasons, we conclude, as a matter of law, that the thieves were not acting within the scope of their employment when they committed the crime for which Mrs. Schecter asks us to impose liability upon MHD.

D. *Negligent hiring, training, and supervision.*

■ In *Fleming v. Bronfin,* 80 A.2d 915, 917 (D.C.1951), the court stated:

> One dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment. This principle has been applied in a variety of cases dealing with innkeepers, carriers, stores, apartment houses, and other businesses.

*Accord, Murphy v. Army Distaff Found., Inc.,* 458 A.2d 61, 64 (D.C.1983); RESTATEMENT, (SECOND) OF AGENCY § 213 & cmt. g (1957). Potential recovery in tort for negligent hiring or retention of an employee is not based on *respondeat superior,* but rather on proof of negligence on the part of the employer himself. *Fleming,* 80 A.2d at 917. Especially where, as in this case, the employer knows that the employee will have free and independent access into the homes of its customers, the employer has an obligation to make reasonable efforts to inquire into such employee's past employment and past record. *See, e.g., Abbott v. Payne,* 457 So.2d 1156, 1157 (Fla.Dist.Ct.App.1984).

■ In the present case, the plaintiff attempted to introduce evidence at trial to the effect that prior to being hired to work for MHD and Mr. Young, Jason Brown entered a plea of guilty to fourth degree burglary with the intention to commit theft from a dwelling. Therefore, Mrs. Schecter argued, there was a danger that Brown would steal if he were admitted to customers' homes in the performance of his duties on MHD's behalf. The judge was of the opinion, however, that proof of the crime (or of Jason Brown's criminal tendency) "would be relevant to the issues of the case [only] *if there is a finding* that he is either an employee or agent of Merchants Home Delivery in a master/servant relationship." (Emphasis added.) Because the judge subsequently ruled as a matter of law that the evidence was insufficient to establish that Mr. Brown was an employee of MHD, the condition for the admission of the evidence was not satisfied.

"We have ruled, however, in Part II.A. of this opinion, that an impartial jury could

reasonably find that Mr. Young and Mr. Brown were MHD employees. The condition suggested by the judge for the admissibility of Brown's criminal record has thus now been satisfied." [12] Moreover, Mr. Fritz testified as follows:

Q. Okay. Now, is it not correct that most of these delivery drivers work with assistants?

A. Yes, have helpers on their truck.

Q. And Merchants Home Delivery knew that the drivers had assistants with them on the trucks.

A. Yes.

Q. Now you didn't interview the helpers before they were hired to work with the delivery drivers, did you?

A. No, because they didn't work for us.

Q. And Merchants Home Delivery did not do background checks on the helpers before they were hired as they did with delivery drivers, did they?

A. No.

Counsel for Mrs. Schecter claim on appeal, based on the foregoing evidence, that

Merchants Home Delivery utterly failed in its duty to supervise, train and maintain Allen Young and Jason Brown as its delivery personnel. Merchants Home Delivery had a duty to anticipate and guard against its employees' human traits that could cause harm to others. It breached that duty when it employed Mr. Brown, an individual with a record for burglary and theft, to remove personal property from customers' homes when it had no knowledge of his background and provided no training or supervision of his activities. It also breached that duty when it provided no

supervision or training to Mr. Young with respect to his supervision of Mr. Brown. As such, Merchants Home Delivery is directly liable for Messrs. Young's and Brown's wrongdoing towards Mrs. Schecter.

Although the foregoing assertion may be premature before the case is retried under the correct legal standard, we agree with Mrs. Schecter that there is sufficient evidence of negligent hiring, training, and supervision to require submission of the issue to the jury. Since Mr. Brown was one of the thieves, there is also sufficient evidence to go to the jury on the question whether any negligence in his hiring or retention proximately caused the loss of which Mrs. Schecter complains.

### III.

### CONCLUSION

For the foregoing reasons, and although we agree with the trial judge's ruling that the theft of Mrs. Schecter's valuables by Mr. Young and Mr. Brown was not committed within the scope of their employment, the decision of the trial court granting JMOL in favor of MHD is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion.

*So ordered.*

---

12. There were other issues raised at trial regarding Mr. Brown's alleged conviction, including whether the person convicted was in fact the same Jason Brown. We confine ourselves to ruling that if the conviction was that of the Jason Brown who participated in the theft in this case, the evidence is relevant.