*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-AA-0225

RAHAMA WRIGHT *et al.*, PETITIONERS,

V.

OFFICE OF WAGE HOUR, RESPONDENT,

and

LISA BECK, INTERVENOR.

On Petition for Review of a Decision of the
Office of Administrative Hearings
(2019-OWH-000077)

(Submitted June 13, 2023                    Decided September 7, 2023)

*Sarah P. Hogarth*, *Lauren H. Evans*, *Himanshu Patel*, and *Abbey Bowe* were on the brief for petitioners.

*Karl A. Racine*, Attorney General for the District of Columbia at the time, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Lucy E. Pittman*, Assistant Attorney General, filed a statement in lieu of brief for respondent.

*Jason R. Engel* was on the brief for intervenor.

Before MCLEESE and DEAHL, *Associate Judges*, and THOMPSON, *Senior Judge.*

THOMPSON, *Senior Judge*:  This matter is a petition for review of an Office of Administrative Hearings ("OAH") order finding Rahama Wright and her business, Shea Yeleen Health and Beauty LCC ("Shea Yeleen"), liable for unpaid wages and liquidated damages claimed by intervenor Lisa Beck under the District of Columbia Wage Payment and Collection Law[1] ("WPCL"), as well as for a statutory penalty. The petition challenges the OAH order on a number of grounds, asserting primarily that the OAH Administrative Law Judge ("ALJ") erred in concluding that Ms. Beck was an "employee" — not an independent contractor — and that Ms. Wright individually (and not just Shea Yeleen) is liable as an "employer."

We begin our analysis by rejecting Ms. Beck's arguments that Ms. Wright is the only proper petitioner and that our review is limited to the issue of whether she is individually liable.  On the merits, we hold that Ms. Beck provided some services to Shea Yeleen as an independent contractor and other services as an employee, and we uphold OAH's conclusion that she is entitled to liquidated damages for the

---

[1] *See* D.C. Code § 32-1301 *et seq.*  Under the WPCL, an "employer" is responsible to timely pay an "employee" earned wages in the event of a discharge or resignation, D.C. Code § 32-1303(1)-(2), and is liable for liquidated damages, *see id.* § 32-1303(4), and a statutory penalty, *see id.* § 32-1307(b)(1), for failure to make timely payment.  However, the statute's provisions do not apply with respect to workers who are independent contractors.  *See Steinke v. P5 Sols., Inc.*, 282 A.3d 1076, 1083 (D.C. 2022).

services she performed as an employee.  However, we reject petitioners' contentions that the record is insufficient for our review, that there was not substantial evidence to support Ms. Beck's claim about the hours she worked, and that only Shea Yeleen, and not Ms. Wright, was Ms. Beck's "employer."  We therefore affirm the OAH decision in part, vacate it in part, and remand for a redetermination of the amount of the damages award (and, as it might be affected by our ruling on Ms. Beck's employee status, the penalty).

## I.     Background

Shea Yeleen is a small business that imports shea butter from women-owned businesses in Ghana and sells the substance in bulk to other companies and in beauty products that Shea Yeleen makes.  Ms. Wright is Shea Yeleen's founder, owner, and chief executive officer, having founded the business after her service as a Peace Corps volunteer motivated her to help alleviate the poverty of the people she had served in West Africa.  In the spring of 2017, Ms. Wright placed an ad on American University's career website seeking part-time assistance from someone with social-

media experience. Ms. Beck, who would soon graduate from the university with a public relations degree, applied for the position and submitted sample written work, and Ms. Wright hired her after an interview in which she was required to draft social-media posts on the spot.

Ms. Wright sent Ms. Beck a contract[2] that specified that Ms. Beck would be an independent contractor and "provide services of 20-60 hours a month. The contract limited Ms. Beck's compensation to an hourly rate (that could increase based on "agreed upon sales metrics") and reimbursement for out-of-pocket costs. Ms. Beck was to track her time and submit invoices for payment. The contract's terms excluded employee benefits such as paid vacation and insurance. As to Ms. Beck's responsibilities, the contract listed "activities related to communication, marketing, and sales for Shea Yeleen," such as creating written content for social media, writing press releases, "[p]romot[ing] Shea Yeleen spokespersons to the media as sources of expert commentary on trade and women in rural West Africa," researching market data and developing specific approaches to marketing Shea Yeleen products, and developing and attending sales events. The contract stated that it would terminate on September 30, 2017, roughly four months after Ms. Wright

---

[2] Ms. Wright's counsel drafted the contract and Ms. Wright had used it with social-media consultants who preceded Ms. Beck.

sent the contract to Ms. Beck. Ms. Beck began working for Shea Yeleen in June 2017.

Ms. Beck's work for Shea Yeleen fell into three broad categories: social media, events, and administrative work. Her invoices reflect that her social-media work included posting on Instagram, Twitter, and Facebook, and producing a newsletter. Ms. Beck's administrative tasks included receiving deliveries; packaging, mailing, and delivering Shea Yeleen products; organizing Shea Yeleen's office and acting as its receptionist; advertising a sublease of that office; and completing other work labeled on Ms. Beck's invoices as "admin."

Ms. Wright testified that Ms. Beck created social-media posts for Shea Yeleen mostly using her personal phone and computer. Ms. Wright shared with Ms. Beck a work plan that described "goals and vision for [Shea Yeleen's] social media," including creating visibility for "the different things that the company was doing," increasing consumer understanding of shea butter and fair trade, identifying speaking opportunities for Ms. Wright, updating a "press kit," and arranging for published interviews about the company. But Ms. Beck enjoyed "considerable discretion" in choosing her social-media projects and "was not closely supervised" in completing them, though Ms. Wright sometimes proofread content before Ms.

Beck posted it. Ms. Beck often worked from home and could choose her own hours. She could take vacation time without Ms. Wright's approval. As further explained *infra*, during at least part of her tenure with Shea Yeleen, Ms. Beck worked in the Shea Yeleen office two to three days a week.

Ms. Wright paid Ms. Beck using business checks and, at Ms. Beck's request, via Venmo starting in March 2018. Ms. Wright never withheld taxes from Ms. Beck's pay, but issued 1099 tax forms to her. Ms. Beck started working a second job in March or April 2018 to supplement her income.

Ms. Beck initially submitted monthly invoices to Shea Yeleen but eventually began sending them less frequently because the company was slow in paying. Ms. Beck understood this to be because Shea Yeleen was waiting on funding from investors. Ms. Beck stopped working regularly for Shea Yeleen at the end of September 2018 and got a new job, but she stayed in touch with Ms. Wright. The two met for dinner in October 2018, and Ms. Wright asked Ms. Beck to submit any outstanding invoices. In mid-February 2019, after reminders from Ms. Wright, Ms. Beck emailed Ms. Wright several outstanding invoices totaling $11,642.60 in alleged unpaid wages. Her email "advise[d]" Ms. Wright "that all charges are due and payable immediately," but offered to accept payments in installments over six

months. Ms. Beck's demand for over $11,000 "shocked" Ms. Wright, who referred to the 60-hours-per-month limitation that had been specified in the (expired) contract.[3]

After Ms. Beck and Ms. Wright were unable to resolve their differences, Ms. Beck filed a complaint with the Office of Wage Hour ("OWH") against Ms. Wright and Shea Yeleen, alleging that Shea Yeleen did not pay all of her wages that were due. On November 14, 2019, OWH issued an Initial Determination, concluding that "Respondent" failed to pay Ms. Beck's wages owed for July 2017 through September 2018.[4] Ms. Wright requested a formal hearing before OAH, contending that Ms. Beck was not an employee, but an independent contractor. OAH granted the hearing request, and the ALJ held a video hearing over four days: March 22,

---

[3] Ms. Wright did mail Ms. Beck a check for $2,500, an amount she testified she calculated based on that limit, but the check was delivered to Ms. Beck's old address and returned to Ms. Wright.

[4] The Initial Determination recites that "[t]he Respondent failed to respond to the complaint" and states that "the allegations in the complaint shall be deemed admitted." Ms. Wright asserts that she did not receive notice of the complaint or investigation. It appears that throughout the litigation, no one has suggested that OWH's "deemed admitted" reference foreclosed OAH review, or forecloses review by this court. To the extent there is an issue as to this, we deem it waived.

April 14, April 19, and May 19, 2021.[5] A few months before the hearing, Ms. Wright paid Ms. Beck $4,233.44, an amount that she agreed Ms. Beck was owed under the (expired) contract's 60-hours-per-month cap.

The OAH ALJ heard testimony remotely from a number of witnesses. At the beginning of the hearing's April 19 session, the OAH recording device failed to record, and an hour and fifty minutes of testimony went unrecorded. Therefore, no transcript of that testimony exists.[6] According to a certified narrative produced by the ALJ, that testimony included the cross-examination, redirect examination, and re-cross of Ms. Beck's father; portions of Ms. Beck's testimony, including testimony explaining how she generated certain invoices and why some invoices covered overlapping dates; and both parties' arguments on Ms. Wright's motion to dismiss.[7] Upon discovering the recording gap, the ALJ proposed to the parties that, if the OAH

---

[5] The case faced delays due to the Mayor's declaration of a public health emergency in March 2020.

[6] OAH Rules of Practice and Procedure provide that "[a]ll proceedings, except for mediations, shall be recorded" and that "[t]he recording is the official record of what occurred at the proceeding." 1 D.C.M.R. § 2827.1 (2023).

[7] The certified narrative states that "[p]roceedings following this point, beginning with Ms. Wright's direct testimony, are recorded," but the transcript of the proceedings that follows shows that the opening portion of Ms. Wright's testimony (to which Ms. Beck's counsel objected as improper narrative) was not recorded or transcribed.

ruling were to be appealed, he could create a certified narrative of the missing transcript using his notes. Ms. Beck's counsel agreed to this proposal; Ms. Wright's attorney remarked, "I mean I don't know what else we could do." The testimony during the remainder of the multi-day hearing was recorded.

The ALJ issued a Final Compensation Order on March 8, 2022, in Ms. Beck's favor. While the ALJ found the matter was "close," he concluded in his order that Ms. Beck was an employee, not an independent contractor. The ALJ found that Shea Yeleen had no independent records to dispute the hours that Ms. Beck worked and that Ms. Beck satisfied her burden by showing "as a matter of just and reasonable inference," D.C. Code § 32-1308.01(e)(4)(B), the hours of work she performed and the compensation that was due.[8] The ALJ awarded Ms. Beck $11,516.89 in unpaid wages and $34,550.67 in liquidated damages pursuant to D.C. Code § 32-1303(4), minus a credit of $4,223.44 for the amount Ms. Wright paid Ms. Beck after the case was filed, for a total of $41,844.12.[9] The ALJ determined that "Ms. Wright as well

---

[8] Both parties introduced into evidence invoices that had been prepared by Ms. Beck, but although they covered the same time periods, the invoices were not always identical.

[9] The ALJ recognized that an award of liquidated damages should be "capped at three times the wages that are due" (citing D.C. Code §§ 32-1303(4) and 32-1308.01(f)(2)). He then calculated liquidated damages as three times $11,516.89, which comes to $34,550.67. As to Ms. Wright's January 2021, payment to Ms. Beck

as Shea Yeleen were employers responsible for [payment of the] award." *See* D.C. Code § 32-1301(1B) (defining "employer"). The order also imposed a $13,450 statutory penalty.

Ms. Wright filed a petition for review of the ALJ's order in this court on April 6, 2022. On June 24, 2022, the ALJ sent the parties a proposed certified narrative of the missing transcript from the April 19, 2021, portion of the hearing. The parties could then "submit comments approving or submitting proposed changes or corrections to the narrative." Ms. Beck submitted comments with proposed changes, and Shea Yeleen opposed the certified narrative on "procedural grounds and on the assertion that it may omit important information." The finalized certified narrative, issued on August 9, 2022, sets out a four-page summary of the missing transcript.

---

in the amount of $4,233.44, the ALJ stated that this amount would be "credited against the final award," apparently because it had not been paid by the date of the Initial Determination (November 14, 2019). It is not clear why that is the relevant date, but petitioners have not challenged the ALJ's reasoning on this point or advocated for a different order of operations (e.g., deducting the $4,233.44 payment from unpaid employee wages before performing the three-times calculation). Accordingly, we do not address the issue further. In the discussion *infra*, we do, however, explain why we conclude that OAH must revisit the $11,516.89 unpaid-wage and liquidated-damages amounts.

## II.     Analysis

## A. Scope of the Petition for Review

We turn first to the parties' arguments about the scope of the petition for review and the relief available.  The background of this issue is as follows.  The April 6, 2022, petition for review in this matter was signed and filed by Ms. Wright, who was proceeding pro se at the time.  Thus, it was not signed by counsel, but it sought review of the OWH order "against Rahama Wright and Shea Yeleen."  The petition named OWH as the "Respondent (Agency)."  In a May 5, 2022, Notice of Intention to Intervene also seeking dismissal of the petition, Ms. Beck argued that because she was not named as a party in the petition, the petition should be deemed to "only appeal[] the Order with regard to the statutory penalties assessed." Thereafter, counsel for Ms. Wright and Shea Yeleen entered their appearances, and, on October 31, 2022, they filed a motion to correct the case caption.  This court denied that motion, citing D.C. App. R. 42(c) — which clarifies that "[a]ny right to proceed pro se does not include the right to represent other parties to the same proceeding" — even though Ms. Wright and Shea Yeleen were no longer pro se. Counsel thereafter filed their November 15, 2022, Omnibus Motion (1) to Defer Consideration of the Proper Named Petitioners to a Motion or Merits Division; (2)

to Reconsider Petitioners' Motion to Correct Case Caption; (3) to Reconsider Off-the-Record Decision Striking Petitioner; or (4) Alternatively, to Proceed on an Amended Petition or for Leave to Intervene.  By order dated December 5, 2022, this court referred that omnibus motion to the instant merits panel.

In her brief on the merits, Ms. Beck emphasizes again that the petition did not name her as a respondent, argues that "Ms. Wright and Shea Yeleen did not appeal the decision against Ms. Beck," and contends that "the only issue properly on appeal is the statutory penalty imposed against Ms. Wright personally, [and] that is the only ruling that could properly be overturned on appeal."[10]  We reject these arguments.

D.C. Code § 2-1831.16(h) provides for naming any "parties before the [OAH]" as "parties in any . . . proceeding for judicial review" of an OAH decision.  However, Rule 15(a)(3)(B) of the rules of this court requires "nam[ing] the agency as a respondent," and Rule 15(d) permits intervention by "[a] party to the agency

---

[10] Ms. Beck also invoked the doctrine of res judicata, arguing that all claims against her were "adjudicated finally in the [OAH] action, because Ms. Wright and Shea Yeleen did not appeal the decision against Ms. Beck."  But as explained *infra*, Ms. Wright could not file a petition for review "against Ms. Beck."  We are satisfied that the petition for review encompassed OAH's decision in Ms. Beck's favor, and res judicata does not preclude our appellate review of the claims involving Ms. Beck.

proceeding." D.C. App. R. 15(a)(3)(B), (d); *see Francis v. Recycling Sols., Inc.*, 695 A.2d 63, 86 (D.C. 1997). Even if § 2-1831.16(h) is fairly read as requiring that Ms. Beck have been named as a respondent,[11] the petition indicated an intent to seek review of the "decision and order" without limitation and identified Ms. Beck as a party who appeared before the agency, and Ms. Beck has shown no prejudice from how the petition for review was captioned. We decline to penalize Ms. Wright and Shea Yeleen for following the guidance in our Rule and case law.

As to the issue of who is the petitioner or who are the petitioners in this matter, we hereby grant the pending omnibus motion to the extent of (1) recognizing that both Ms. Wright and Shea Yeleen, now both represented by counsel, are petitioners; (2) directing that the amended petition that was lodged with the omnibus motion be filed; and (3) instructing that the case caption be amended to reflect these rulings.[12]

---

[11] Section 2-1831.16(h) states that "[o]nly the parties before [OAH] or any other party permitted to participate by the reviewing court *shall be parties* in any such proceeding for judicial review[,]" D.C. Code § 2-1831.16(h) (emphasis added), but sometimes "'shall' can mean 'may' in a statute." *Forrest v. Spizzirri*, 62 F.4th 1201, 1204 n.3 (9th Cir. 2023) (citing *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 432 n.9 (1995)).

[12] Even if the motions panel had not referred the omnibus motion to the merits panel, we would not be bound by the motion panel's disposition of the issues. "Although appellate courts generally adhere to a ruling made on a prior motion, such adherence is discretionary." *Jung v. Jung*, 844 A.2d 1099, 1107 n.8 (D.C. 2004). As such, "[a] merits panel of this court will not consider itself bound by an order of

The rules of this court provide that "[i]f the petitioner is a corporation or other entity, the petition must be signed by counsel" and that "[a] petition not bearing the necessary signature will be stricken unless omission of the signature is corrected promptly after being called to the attention of counsel or the party." D.C. App. 15(a)(5). As we have held, Rule 15(a)'s signature requirement is not jurisdictional in nature and therefore "a signature irregularity" does not necessarily require dismissal of a petitioner. *See Moore Energy Res., Inc. v. Pub. Serv. Comm'n of D.C.*, 785 A.2d 300, 306 (D.C. 2001). We explained in *Moore* that while there are valid public policy reasons for requiring corporations to appear through counsel, "those concerns are inapplicable to the . . . situation where [as here] counsel has been entered on behalf of the corporation before briefing even began."[13] *Id.* at 305. We recognized that there are "separate and equally compelling policy reasons" for "permit[ting] a corporation to cure its petition for review if it was not initially signed by counsel," including that "the opposing party's legal positions are generally unprejudiced by the irregularity or a rule permitting the irregularity to be cured" as

---

a motions panel if a previous ruling in the case is not sufficiently final or is clearly erroneous in light of newly presented facts or a change in substantive law." *Id.* (internal quotation marks omitted).

[13] Here, petitioners' opening brief on the merits was filed on November 23, 2022, i.e., after counsel had entered their appearances.

well as this court's "strong judicial and societal preference for the resolution of disputes on their merits rather than by default." *Id.* (internal quotation marks omitted). These reasons apply with special force where — as in the instant case — the petition for review "provide[s] the agency, and any interested parties, with notice that a review of a particular agency decision or order has been requested" and no party argues it was misled by the irregularity or prejudiced by the decision to permit the irregularity to be cured. *Id.* We discern no reason why we should decline to recognize both Ms. Wright and Shea Yeleen as petitioners, particularly given that the issue of whether Ms. Beck was an employee is a common issue pertinent to whether the damages award and penalty can be upheld.

Finally, we pause to address Ms. Beck's assertions, made in her motion to dismiss (which this court denied as moot) but not raised in her brief on the merits, that Ms. Wright failed to serve her with the petition both initially and after this court issued an order directing Ms. Wright to serve the petition on Ms. Beck or her counsel within 15 days of the order, with proof of service submitted to the court, and stating that "failure to comply . . . shall result in the dismissal of the petition." Ms. Beck urges us to dismiss the petition on this basis. We conclude for the following reasons that Ms. Beck is not entitled to relief on this basis.

Our more general case law on service of process "allow[s] for a case to proceed despite improper or untimely service if the court finds good cause why the case should not be dismissed" and finds that the severe penalty of automatic dismissal is not required. *Neill v. D.C. Pub. Emp. Rels. Bd.*, 93 A.3d 229, 241 (D.C. 2014). The relevant considerations are whether the failure to serve was willful (e.g., deliberate delay or contumacious conduct) and whether there was prejudice from the untimely service. *Id.* Where failure to serve the petition "resulted from inadvertence or negligence at worst," there generally is not a sufficient basis for dismissing the petition. *Id.* Here, it appears that the failure to serve Ms. Beck was a result of Ms. Wright's having filed the petition pro se. But Ms. Wright moved to extend the time to serve Ms. Beck or her counsel, this court granted that motion, and Ms. Beck thereafter was served within the extended time. In addition, Ms. Beck has made no showing of prejudice from the delay. Moreover, she somehow received notice that enabled her to seek to intervene less than a month after the petition was filed. For these reasons, we find no cause for dismissing the petition.[14]

---

[14] We note that "[s]ervice of process goes to the court's power over the party to be served, not the court's ability to consider the subject matter of the case, i.e., its subject-matter jurisdiction." *Neill*, 93 A.3d at 239-40.

## B. The Certified Narrative

Petitioners contend that the ALJ improperly relied, to their prejudice, on the certified narrative of testimony presented during the one-hour-and-fifty-minutes recording gap.[15] In fact, the ALJ appears to have relied on his notes that he used to create the narrative. The real issue, as petitioners recognize, is whether, without the unrecorded testimony and resort to the certified narrative, this court is in a "position to decide whether the [agency] determination was supported by substantial evidence or not." *Murchison v. D.C. Dep't of Pub. Works*, 813 A.2d 203, 206 (D.C. 2002) (per curiam). For the reasons that follow, we are satisfied that the record, including the certified narrative, permits us to properly exercise our review.[16]

---

[15] Ms. Beck argues that Ms. Wright waived this challenge by failing to raise it before the ALJ. Ms. Beck is correct that a party generally will not be permitted to seek review of an issue that it failed to raise before the agency. *See D.C. Hous. Auth. v. D.C. Off. of Hum. Rts.*, 881 A.2d 600, 611 (D.C. 2005). However, we are satisfied that Ms. Wright adequately preserved a challenge to the prepared certified narrative, even if her counsel was less than forceful in expressing displeasure at the ALJ's proposal to prepare a certified narrative. After the ALJ circulated a draft of the narrative to the parties, Ms. Wright definitively "opposed submission of the certified narrative [on] procedural grounds and on the assertion that it may omit important information."

[16] We elect to decide this issue even though we agree with Ms. Beck that had petitioners lodged an objection at the time the ALJ discovered and advised the parties that testimony had not been recorded, her counsel could have recalled (or petitioners' counsel could have called in their case), the witnesses, who testified remotely and could have been asked to log back in to the proceeding. The failure to object, at a

Petitioners do not dispute the ALJ's certified account insofar as it indicates that almost half (the first 47 minutes) of the unrecorded testimony was testimony by Ms. Beck's father, who described his efforts to assist his daughter through correspondence with Ms. Wright and with the IRS in 2019. His was testimony that we do not discern to be relevant to any of the issues before us. Excluding time for a recess and time during which the ALJ heard argument on the Wright/Shea Yeleen motion to dismiss the OWH matter, and excluding whatever time was consumed by Ms. Wright's opening narrative testimony (*see supra* note 7), the remainder of the unrecorded proceedings included 27 minutes of testimony by Ms. Beck.

Petitioners assert that this unrecorded testimony by Ms. Beck covered "critical factual issues" such as what activities Ms. Beck performed for Shea Yeleen and the accuracy of her billing records. Specifically, it appears that the unrecorded testimony included Ms. Beck's explanation about her use of "Toggl" timekeeping software to record time worked at home but another system and spreadsheet to record time worked in the Shea Yeleen office or at events. To the extent the unrecorded testimony covered that topic, so do several portions of recorded testimony and

time when the content of the testimony would have been fresher in everyone's minds, means that petitioners contributed to the situation about which they now complain.

documents in the record, including an email between Ms. Beck and Ms. Wright on this topic.[17] As to the possibility that the unrecorded testimony addressed what activities Ms. Beck performed for Shea Yeleen, nothing in the record suggests the types of tasks Ms. Beck performed (as distinguished from the time spent on each type of task) was in dispute. Ms. Beck relied on her invoices, which were admitted into evidence and are available for our review, as evidence of the amount of time she worked and, elsewhere in her testimony, she acknowledged that she could not say exactly what she did on specific days (beyond the often-imprecise work description in her invoices).[18] For these reasons, petitioners have not persuaded us that the unrecorded testimony precludes adequate and meaningful review of the issues raised.

Nor are we persuaded that petitioners have been prejudiced by the recording gap. "In reviewing administrative orders" we "may invoke the rule of prejudicial

---

[17] The email from Ms. Beck to Ms. Wright explained that "the [T]oggl invoice [is] just from when I work at home. The other invoice is everything I've done via events and in the office."

[18] Moreover, the certified narrative confirms Ms. Beck's testimony about the imprecision in some of her task descriptions in her admitted exhibits (in particular, Exhibit 242): her acknowledgment that the exact work she did on the days in question (May 11-15) "may not be recorded," that she "was probably working on graphics and communications," and that it was "[m]ost likely she did social media and organizing things."

error," D.C. Code § 2-510(b), under which "reversal and remand is [sic] required only if substantial doubt exists whether the agency would have made the same ultimate finding with the error removed." *Arthur v. D.C. Nurses' Examining Bd.*, 459 A.2d 141, 146 (D.C. 1983). Here, as discussed further *infra*, the ALJ found Ms. Beck's testimony about her invoices credible despite various discrepancies, and we have no reason to doubt that it was Ms. Beck's demeanor (and other factors that affect a factfinder's determination of witness credibility) over several hours of testimony, rather than any specific testimony during the 27 minutes in question, that primarily led the ALJ to reject any suggestion that the invoices, some of which were revised or reconstructed, were fraudulent.[19]

Moreover, as discussed below, Ms. Beck's invoices were substantial evidence beyond the unrecorded testimony that supports the ALJ's determination as to Ms. Beck's uncompensated time. We discern no reason to think that the missing testimony would have rendered the transcribed testimony (and accompanying

---

[19] The ALJ cited Ms. Beck's untranscribed testimony only once, along with her earlier recorded testimony from the March 22 proceeding, in crediting her explanation about her use of Toggl and about why some of her invoices covered the same dates but not overlapping times.

exhibits) insubstantial[20] or would have caused the ALJ to conclude that Ms. Beck failed to show "as a matter of just and reasonable inference, the amount of work done."[21] We therefore do not "substantial[ly] doubt" that the ALJ would have reached the same conclusion about the amount of uncompensated time if the unrecorded testimony had been transcribed. *Id.* at 146. We also discern no reason to think that the missing testimony would impact this court's de novo determination regarding whether Ms. Beck was an employee.[22] And as petitioners have not identified any specific error or omission in the certified narrative, the "mere possibility of error [is] too remote to justify reversal based on inadequacy of the

---

[20] An OAH order must stand when (1) the ALJ "made findings of fact on each materially contested issue of fact"; (2) "substantial evidence supports each finding"; and (3) the ALJ's "conclusions flow rationally from its findings of fact." *Hickey v. Bomers*, 28 A.3d 1119, 1122 (D.C. 2011) (quoting *Morris v. U.S. Env't Prot. Agency*, 975 A.2d 176, 180 (D.C. 2009)).

[21] D.C. Code § 32-1308.01(e)(4)(B); *see also District of Columbia v. Bongam*, 271 A.3d 1154, 1163 (D.C. 2022) ("[I]f the employer fails to discharge its burden of producing accurate or adequate records, the court must calculate and award damages, even if only an approximation.").

[22] We review a trial court's purely factual determinations for clear error, but the question whether those facts make someone an employee or an independent contractor is reviewed de novo. *Steinke*, 282 A.3d at 1085; *cf. Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 9 (D.C. Cir. 2001) (applying clear error standard to findings of fact in FLSA case examining employee status); *id.* at 10 n.3 ("Whether an individual is an 'employee' within the meaning of the FLSA is a legal question.").

record[.]" *In re D.B.*, 947 A.2d 443, 455 (D.C. 2008) (citing *Lucas v. United States*, 476 A.2d 1140, 1142-43 (D.C. 1984)).

### C. Ms. Beck's Invoices

Petitioners also challenge the probative value of Ms. Beck's invoices, arguing that the invoices did not constitute substantial evidence to support the ALJ's determination about the amount of time worked and the unpaid wages. They argue that Ms. Beck's "reconstructed invoices" contained "descriptors changed to support Beck's theory of the case" and "factored heavily in the ALJ's determination of liability." They further assert that the ALJ's reliance on Ms. Beck's invoices was arbitrary and capricious, particularly because (1) Ms. Beck introduced nine more invoices than Ms. Wright introduced and there was no documentary evidence that Ms. Beck actually sent five of those nine invoices to Ms. Wright; (2) some of Ms. Beck's invoices cover overlapping time periods; and (3) some of the invoices Ms. Beck introduced differ from those she sent Ms. Wright.

The record does indeed reflect the discrepancies petitioners point out, but we discern no reversible error because the ALJ's acceptance of the invoices introduced by Ms. Beck was grounded in his credibility determinations, to which we "accord[]

special deference." *Marriott at Wardman Park v. D.C. Dep't of Emp. Servs.*, 85 A.3d 1272, 1276 (D.C. 2014) (internal quotation marks omitted). While this court is "limited to a paper record," the ALJ could observe witness testimony and "assess the demeanor of the witness." *Hamilton v. Hojeij Branded Food, Inc.*, 41 A.3d 464, 481 (D.C. 2012). Regarding the invoices that Ms. Beck produced but Ms. Wright claimed not to have received, the ALJ credited Ms. Beck's testimony that she sent these invoices to Ms. Wright but could not retrieve the transmission messages. We have no basis for second-guessing the ALJ's determination to credit Ms. Beck, especially considering that Ms. Beck introduced evidence that she sent Ms. Wright four invoices that Ms. Wright did not produce, and given Ms. Wright's acknowledgment that she (Ms. Wright) might not have saved every invoice from Ms. Beck. Likewise, we defer to the ALJ's determination to credit Ms. Beck's testimony explaining that some of her invoices shared dates because she logged her at-home hours separately from her in-office hours and submitted correspondingly separate invoices. As noted above, the record contains a corroborative email dated March 5, 2018, to Ms. Wright from Ms. Beck articulating the same explanation for the overlap.

As for the discrepancies between invoices for the same time periods that were separately introduced by both Ms. Beck and Ms. Wright, our review of the record

confirms that the formatting differed, some had one-word differences in the work described, some bore Ms. Beck's name and others did not, and some had discrepancies in the amount of time billed or dollar amount invoiced. Ms. Beck testified that these discrepancies stemmed from her "redo[ing]" the invoices "to make them more accurate" and detailed. Petitioners assert that Ms. Beck's "reconstructed invoices" "led to a damages overage of more than $15,000." But Ms. Wright confirmed in her testimony that she asked Ms. Beck for more-detailed invoices on multiple occasions,[23] and the ALJ was satisfied that the various discrepancies were not "evidence of fraud or even negligence" and that they stemmed from Ms. Beck editing her invoices to make them more accurate. We have no basis for disturbing that credibility determination.

### D. Ms. Beck's Status and Damages

We now turn to petitioners' main argument, which is that Ms. Beck was an independent contractor, not an employee protected by and entitled to liquidated damages under the WPCL. In the alternative, petitioners argue that some of Ms.

---

[23] For example, in August 2018, Ms. Wright asked Ms. Beck to "[p]lease go back and update [her invoices] with detail" because they had "huge amounts of hours . . .categorized under ['other']."

Beck's work was as an independent contractor even if other work was as an employee.[24] The ALJ found the issue to be "close," but concluded Ms. Beck was an employee. Exercising de novo review and applying the tests we adopted in *Steinke v. P5 Solutions, Inc.*, 282 A.3d 1076 (D.C. 2022), we conclude instead that Ms. Beck provided social-media services to Shea Yeleen as an independent contractor and provided events-related and administrative services as an employee. With respect to Ms. Beck's social-media work, we agree with petitioners that the issue "is not close at all."

In *Steinke* we adopted the "economic reality" test established under the Fair Labor Standards Act ("FLSA") for determining employment or independent contractor status under the WPCL. 282 A.3d at 1084-85. We identified the following factors to be considered:

> 1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> 2) the alleged employee's opportunity for profit or loss depending upon h[er] managerial skill;
>
> 3) the alleged employee's investment in equipment or materials required for h[er] task, or h[er] employment of workers;

---

[24] Petitioners suggest vacatur of the OAH ruling as to all dates prior to July 25, 2018.

4) whether the service rendered requires a special skill;

5) the degree of permanency and duration of the working relationship;

6) the extent to which the service rendered is an integral part of the alleged employer's business . . .

[7] whether or not the work is a part of the regular business of the principal . . . [;]

[8] whether or not the parties believe they are creating the relationship of employer-employee[.]

*Id.* (internal quotation marks and citations omitted). We recognized in *Steinke* that assessing a worker's status under the WPCL requires a fact-intensive inquiry and consideration of the totality of circumstances and that no one factor standing alone is dispositive. *Id.* at 1085.

We further recognized in *Steinke* that a worker's status may change over time (in that case, from an independent contractor to an employee). *Id.* at 1088. And we now agree with courts that have recognized that a worker may "provid[e] some labor as an employee while also providing different, additional labor as an independent contractor." *Leevson v. Aqualife USA Inc.*, 770 F. App'x 577, 582 & n.4 (2d Cir. 2019) (FLSA/wage law case finding no error in a jury instruction that "a worker can be both an employee and an independent contractor concurrently for one employer"); *see also United States v. Isaksson*, 744 F.2d 574, 577 (7th Cir. 1984)

(tax withholding case stating that "it is certainly a reasonable conclusion that an individual may be both an employee and an independent contractor in his relationship to the same company"); *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 135 n.13 (Tex. 2018) (stating, in vicarious liability/negligence case, that "we do not foreclose that the circumstances could give rise to . . . a dual relationship" in which a worker is "both an employee and a direct independent contractor of the same entity"); *Palma v. Ga. Farm Bureau Ins*, 606 S.E.2d 341, 344 (Ga. Ct. App. 2004) ("It is well-settled that 'a person can be an independent contractor in one part of his activity and an employee in another.'") (quoting *Moss v. Cent. of Ga. R.R. Co.*, 219 S.E.2d 593, 596 (Ga. Ct. App. 1975)).

Considering Ms. Beck's social-media work for Shea Yeleen in light of the factors listed above, we conclude with little difficulty that Ms. Beck performed these services as an independent contractor. We start with the "control" factor, which focuses on "control as to the manner in which" work is completed, including *how* a worker does her job. *See Steinke*, 282 A.3d at 1085-86, 1086 n.7. The ALJ found, and the testimony supports, that Ms. Beck "had considerable discretion in selecting her [social media] projects[,] and was not closely supervised." Although Ms. Wright provided Ms. Beck with a "work plan" that listed social-media objectives, the work did not "direct the manner in which [Ms. Beck] was to accomplish the various listed

tasks." *Id*. at 1086.[25] Ms. Beck controlled the performance of her social-media duties for Shea Yeleen, indicating that she performed those duties as an independent contractor.

As to Ms. Beck's opportunity to earn a profit, her pay at an hourly rate does not by itself weigh in favor of her independent contractor status as to her social-media work for Shea Yeleen.[26] Still, in light of what the ALJ found was Ms. Beck's freedom, at least initially, to work "at times that suited her" and her ability to do the social media work from home, she had the ability to manage her time in a way that enabled her to take on other work and to save on commuting costs (and she did do work for another company during her tenure with Shea Yeleen). *Cf. Steinke*, 282 A.3d at 1087 (worker's ability to "do[] work for others" weighed in favor of independent contractor status); *Browning v. CEVA Freight, LLC*, 885 F. Supp. 2d 590, 602 (E.D.N.Y. 2012) (wage law decision reasoning that "the ability to take on

---

[25] Ms. Wright proofread Ms. Beck's social-media content, but "[t]he requirement that the work be done properly is a condition just as readily required of an independent contractor as of an employee and not conclusive as to either." *In re Yoga Vida NYC, Inc.*, 64 N.E.3d 276, 278-79 (N.Y. 2016) (mem.) (internal quotation marks omitted).

[26] Although Ms. Beck's contract gave her "the potential to increase" her hourly rate based on "agreed upon sales metrics," when Ms. Wright raised Ms. Beck's pay, Ms. Wright did so "unilaterally" because (per Ms. Beck's testimony) Ms. Beck was "doing a good job" — not based on "agreed upon sales metric[s]."

other employment supports a finding of independent contractor status"). "[U]nder all of the circumstances, the [hourly-rate] payment arrangement sheds little, if any, light on whether an employer-employee relationship existed" between Ms. Beck and Shea Yeleen. *Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 424 (D.C. 2006).

With regard to investment in materials and equipment required for the work, the evidence was that Ms. Beck used her personal phone and computer for the bulk of her social-media work. Although she testified that she did have access to a computer in Shea Yeleen's office, both she and Ms. Wright also testified that she usually brought her own laptop to use in the office instead. Thus, this factor, too, weighs in favor of Ms. Beck's being an independent contractor with respect to her social-media work. Further, we are satisfied that the social-media work required a "special skill" — skill in working with social media platforms and the press, which Ms. Beck appears to have brought to the job based on her training in public relations and a previous position she had held. We can conclude that the level of skill Ms. Wright sought and Ms. Beck used in her social-media work was more nuanced than (to quote the ALJ) "a college degree and some familiarity with social media."

As to "the degree of permanency and duration" of Ms. Beck's work with respect to social media, her contract "originally envisioned" a no-more-than-60-hours-per-month position lasting just a few months. Ultimately, Ms. Beck worked for Shea Yeleen from June 2017 until September 2018, but that appears to have been because the work Ms. Beck did for Shea Yeleen evolved and expanded, such that Ms. Wright broached the possibility that Ms. Beck might become a full-time employee. These facts do not point toward Ms. Beck having the status of an employee with respect to her social-media work. *See Steinke*, 282 A.3d at 1087 ("It appears from the record that, as originally envisioned, Mr. Steinke's position was permanent, a fact that suggests 'employee' status.").

We next consider whether Ms. Beck's social-media work was integral to Shea Yeleen's business. Ms. Wright testified that Shea Yeleen had "two lines of business." She explained that "[t]he majority of its sales are bulk sales of shea butter to other companies." She testified that while the company also makes and sells finished beauty products, those sales account for a "minuscule" and non-integral percentage of the revenues the company generates and are not a "driver of what keeps [Shea Yeleen's] doors open." She acknowledged that social media work "build[s] awareness," but said that she had seen no evidence that Ms. Beck's social-media work drove sales or generated revenue and emphasized that Shea Yeleen is

not a social-media company.[27]  She further testified that the social-media work did not contribute to the company's revenue-generating bulk sales line.  Ms. Wright also testified that the social-media work was not essential or integral to Shea Yeleen's existence.[28]  Work that is "not integral to the bulk of [the alleged employer's] business" supports independent contractor status.  *Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225, 1237 (10th Cir. 2018).  "A task or activity is considered 'integral' to an employer's business when that employer would be virtually certain to assure that the function is performed, and would obtain the services of whatever workers are needed for this function."  *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1213 (11th Cir. 2003) (internal quotation marks omitted).  The record does not support a conclusion that the social-media work that Ms. Beck did was indispensable to Shea Yeleen's operations.

The record indicates that Shea Yeleen had hired social-media consultants or contractors to perform outreach, marketing, and public relations services at least sporadically before Ms. Beck came onboard.  The record does not establish, however, that social-media work of the type Ms. Beck performed was a "part of the

---

[27] The administrative record shows that some of Ms. Beck's social-media posts were about Shea Yeleen's "ethical beauty" business model.

[28] Shea Yeleen's previous social-media contractor likewise testified that the business would survive without a social media contractor.

regular business" of Shea Yeleen.  *Steinke*, 282 A.3d at 1087; *see also Schecter*, 892 A.2d at 424-25.

Finally, the record indicates that the parties did not believe they were creating an employer-employee relationship as to Ms. Beck's social-media work.  That relationship began with a contract in which Ms. Beck "expressly acknowledge[d] and agree[d] that [she] is an independent contractor."  Moreover, as in *Steinke*, Shea Yeleen did not withhold taxes from Ms. Beck's payments, the parties used 1099 tax forms instead of W-4s (another sign of the parties believing they were forming an independent contract), Ms. Beck was required to submit invoices to get paid, and she enjoyed an at-will vacation policy.  282 A.3d at 1087 & n.8.

Not all of the foregoing factors point in this case toward Ms. Beck having done social-media work for Shea Yeleen as an independent contractor, but considering them in totality, we comfortably conclude that Ms. Beck was an independent contractor as to that work.

We reach a different conclusion as to Ms. Beck's events and administrative work.  Regarding the events work, although (like the social-media work) it was referenced in the independent-contractor contract, Ms. Wright's control and

supervision of Ms. Beck's events work differed from how she related to Ms. Beck as to the social-media work. The ALJ found that Ms. Wright trained Ms. Beck to go to events and promote products. In addition, Ms. Wright determined what and how many Shea Yeleen products Ms. Beck should bring to each event and provided her with sales-processing equipment, including an iPad and credit card reader. Ms. Wright also often provided Ms. Beck with talking points to discuss with customers. In Ms. Beck's relationship with Shea Yeleen, the company gave her business cards to distribute at events that identified her as Shea Yeleen's "Customer Engagement Coordinator." Further, it does not appear that the sales work at events required special skill. As with the social-media work, Ms. Beck did not earn a commission on the products she sold at events and she was paid an hourly wage; but unlike with her social-media work, she was required to do the events work away from home at designated sites, making it more difficult for her to schedule other remunerative work. Also like the social-media work, the events work was envisioned as short-term work under the contract, but notably, Ms. Beck continued to work events for Shea Yeleen from time to time even when she no longer regularly worked for Shea Yeleen (a fact that suggests that the events work was also integral to a portion of Shea Yeleen's business).

Not every *Steinke* factor signals that Ms. Beck performed her events work as an employee; she was not supervised during events, and she testified that she could decline to attend events, which "an employee ordinarily cannot" do. *Schecter*, 892 A.2d at 425. But, on balance, weighing the above-listed factors and construing the provisions of the WPCL liberally since it is a remedial statute,[29] we conclude that Ms. Beck performed her events-related services for Shea Yeleen as an employee.

As to Ms. Beck's administrative work, among the most important evidence is that this work, which included receptionist duties as the sole Shea Yeleen representative in the office, required Ms. Beck to work from Shea Yeleen's office, a limitation on her time and location and impediment to taking on other work that rendered her so "dependent upon" Shea Yeleen as to "come within the protection of the WPCL." *Steinke*, 282 A.3d at 1087. Further, this was not work to which Ms. Beck brought particular skills; she testified that Ms. Wright trained her to perform administrative tasks for Shea Yeleen, instructing her on how to package products for shipment, create shipping invoices, print shipping labels, use the U.S. Postal Service

---

[29] *See Hamilton*, 41 A.3d at 474. The WPCL defines "employee" to include "any person suffered or permitted to work by an employer." D.C. Code § 32-1301(2).

("USPS"), and clean and organize the office to Ms. Wright's requirements.[30] Ms. Beck was paid an hourly wage, and she did not invest in equipment or materials for much of her administrative work, but instead used Shea Yeleen's supplies. Further, the administrative tasks were part of Shea Yeleen's regular business. *Cf. Hickey v. Bomers*, 28 A.3d 1119, 1125 (D.C. 2011) (secretarial services were part of attorney's regular business); *Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11 (D.C. Cir. 2001) (performing tasks such as "going to the post office, [and] doing administrative things" suggested employment relationship).

As to permanency and duration, it appears from the record that the parties' working relationship lasted around 16 months in part because Ms. Wright eventually asked or needed Ms. Beck to be in the office to perform administrative tasks (including during a time when Ms. Wright herself was injured), such that Ms. Wright and Ms. Beck came to agree that Ms. Beck would be in the office on Mondays and Wednesdays. As for whether the parties believed they were forming an employee-employer relationship as to the administrative work, the answer is that the "independent contractor" contract did not purport to include this work.

---

[30] *Cf. Mason v. Afr. Dev. Found.*, 355 F. Supp. 2d 85, 94-95 (D.D.C. 2004) (concluding in a Title VII case that "working as a receptionist, working as administrative assistant, and performing other various tasks, including ordering supplies" did not "require any special skills") (footnote omitted), *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511 (2006).

The ALJ concluded that Ms. Beck was an employee as to all of her work and thus did not determine what portion of the unpaid wages was for what we have determined was independent-contractor social-media work. The parties' evidence was conflicting as to this. The ALJ wrote in his order that Ms. Beck testified that "a substantial part of her time was spent on duties in [Shea Yeleen's] office, receiving shipments, checking mail, preparing invoices, packaging, and mailing outgoing shipments, and acting as a receptionist, among other duties." But that was not Ms. Beck's specific testimony. She did testify that she "helped ship things all the time," but she acknowledged that she could not say exactly what she did on specific days. DaBrielle Goodwin, a witness who shared Shea Yeleen's office space as a subtenant for several months, testified that over about a six-month period, she saw Ms. Beck in the office two-to-three days a week, but was impeached with evidence that her sublease terminated a few months earlier than she had testified. Ms. Beck acknowledged that she did not work three days a week in Shea Yeleen's office during her entire tenure, but there was testimony that she was the only person working in the office while Ms. Wright was recovering from an injury during the spring/summer of 2018. And, as the ALJ found, "Ms. Beck's invoices in 2017 and the first months of 2018 do not contain detailed breakdowns of how she spent her

time." It was only "[b]eginning in March of 2018, [that] the invoices are more detailed."

By contrast, per Ms. Wright's account, "Ms. Beck spent approximately 80% of her time on social media, 15% on events, and 10% on miscellaneous functions," with packaging and shipping products coming to "less than 5[%] of the services that [Ms. Beck] provided." Ms. Wright testified that social media was "what [Ms. Beck] primarily did" and she called Ms. Beck's work on sales events "a very small part" of Ms. Beck's service to Shea Yeleen. Ms. Wright also testified that Ms. Beck delivered Shea Yeleen products "very rarely" but "on occasion" to a Whole Foods near the office and "[m]aybe five times" to another local vendor. And Ms. Wright posited that although Ms. Beck received packages at Shea Yeleen's office, Ms. Beck did so with respect to only a small proportion of the total packages Shea Yeleen received. Ms. Wright testified that Ms. Beck's schedule "was constantly changing."

The ALJ found that "[a]lthough Ms. Beck was hired as a social media consultant, a very considerable part of her job involved the work of an administrative assistant." He also found that the time Ms. Beck spent on these administrative functions "often greatly exceeded the time spent on her ostensible social media duties." He further found that beginning in March of 2018, Ms. Beck's invoices

show that Ms. Beck spent "substantial amounts of time on activities that were not social media related, including events planning and shopping, administrative functions, mailing, and packing." He found in addition that in July 2018, Ms. Beck committed to working in the office on Mondays and Wednesdays from 10:30 am to 5:00 pm. The ALJ neither credited nor discredited Ms. Wright's estimate of the time Ms. Beck spent on various categories of work.[31]

We conclude that a remand is in order for OAH to make a "a quantitative approximation"[32] of what portion of the unpaid wages were attributable to Ms. Beck's social-media work, and what portion was attributable to her other work for Shea Yeleen (and thus subject to trebling), and to redetermine the damages awards. *See District of Columbia v. Bongam*, 271 A.3d 1154, 1163 (D.C. 2022) ("[I]f the employer fails to discharge its burden of producing accurate or adequate records, the court must calculate and award damages, even if only an approximation.")

---

[31] Nor did the ALJ generally discredit or credit Ms. Wright's testimony. The ALJ did specifically credit Ms. Wright's testimony about having sent Ms. Beck a check for $2,500 on March 31, 2019, that was returned because it was mailed to the wrong address.

[32] *St. Pierre v. CVS Pharm., Inc*., 265 F. Supp. 3d 131, 140 (D. Mass. 2017).

We leave it to OAH to determine how to approximate the amounts attributable to the social-media and non-social-media work.[33]  Referring to one of Ms. Beck's detailed invoices and spreadsheets, the ALJ found that for the weeks of June 18 to July 29, 2018, Ms. Beck spent 92.38 hours on matters that did not involve social media, such as email communications, meetings, shopping, mailing, and administrative functions.  A corollary finding would be that only 39.85 (30%) of the total 132.23 hours for that time period were spent on social-media functions.  By contrast, petitioners calculate that for the period March 26-April 29, 2018, Ms. Beck "spent no less than 66% of her time on activities such as 'social media'; 'newsletter'; 'Instagram'; 'pitches'; 'graphics'; 'video shot list'; 'influencer campaign'; 'Event Ideas'; and other activities described in her contract."  As these computations suggest, one approach on remand would be for the ALJ to determine the percentages indicated on Ms. Beck's detailed invoices, and to apply an average percentage to the time shown on the non-detailed invoices to approximate the total time Ms. Beck spent on her work as an "employee" during the entire time period at issue.  Another approach might be the one suggested by petitioners, i.e., applying an assumption that

---

[33] *Cf. Sivaraman v. Guizzetti & Assocs., Ltd.*, 228 A.3d 1066, 1079 (D.C. 2020) ("[I]n fixing a damages award, a trial court is not confined to pick between two implausible extremes offered by the adversarial parties before it. It is free to find that the truth lies somewhere in between where the parties aver, as it often does.").

beginning in late July 2018, Ms. Beck's regular in-office work caused her status to evolve to that of an employee.[34]

We also leave it to OAH to determine in the first instance whether our ruling affects the penalty amount. The statutory penalty is calculated at "$50 for each employee . . . for each day that the violation occurred or continued." D.C. Code § 32-1307(b)(1)(A). The penalty was levied with a start date of "February 18, 2019, the date that [Ms. Beck] demanded $11,642.60" and an end date corresponding with the OWH Initial Determination. Although Ms. Beck's demand letter did not separately break down an amount owed for non-social-media work, the number of days for which she was owed pay for that work seemingly would not change from

---

[34] On remand, OAH will also be free (subject to its consideration of any non-scope-of-remand objections the parties may raise) to revisit its calculations, including its calculation of how much money Ms. Wright paid Ms. Beck via Venmo in 2018, and how that amount affects Ms. Beck's damages. We note that to calculate how much Ms. Wright paid Ms. Beck, the ALJ relied on a table that Ms. Beck submitted into evidence as Exhibit 282. This table tallied Venmo payments from Ms. Wright to Ms. Beck totaling $2,546.24. As the order points out, "[t]his table is supported by screen shots of text messages confirming the Venmo payments." But the screen shots of the Venmo payments appear to include eight more payments from Ms. Wright to Ms. Beck than appear in Ms. Beck's Exhibit 282, for a total of $2,775.43. Specifically, the screen shots appear to show that Ms. Wright paid Ms. Beck $229.19 more than the "Total $ Paid" in Exhibit 282. We surmise that the apparent discrepancy may relate to the principle that "reimbursements for specific expenses" are not "wages" under the WPCL, *see Sivaraman*, 228 A.3d at 1074-75, but that explanation may be incorrect since two payments for "Uber" and "Lyft" appear in Exhibit 282.

the days calculated by the ALJ. We do not, however, foreclose any different reasoning or arguments that OAH, petitioners, or Ms. Beck may bring to bear on the subject.

### E. Ms. Wright's Personal Liability and Employer Status

Finally, we address Ms. Wright's contention that she should not be held personally liable for the damages award and penalty. She argues first that OWH's Initial Determination provided insufficient notice that she could be held personally liable and second that, even if Ms. Beck was an employee, Ms. Wright was not Ms. Beck's "employer" under the WPCL. Neither argument is persuasive. The Initial Determination listed "Rahama Wright" as a "RESPONDENT" directly above "Shea Yeleen Health and Beauty LLC." Therefore, notwithstanding the document's use of the singular "Respondent," we are satisfied that it gave Ms. Wright sufficient notice that she was a respondent (who, as the WPCL directs, "shall comply with the provisions of any order or conciliation agreement affording relief." D.C. Code § 32-1308.01(g)(1)).

In any event, Ms. Wright fits within the WPCL's broad definition of an employer: "with a few exceptions not relevant here[,] 'every individual, partnership, firm, general contractor, subcontractor, association, [or] corporation . . . employing any person in the District of Columbia.'" *Steinke*, 282 A.3d at 1082-83 (quoting D.C. Code § 32-1301(1B)). "[C]ourts in this district have consistently concluded

that 'determinations of employer or employee status under the FLSA apply equally under the District of Columbia wage laws.'" *Bonilla v. Power Design Inc.*, 201 F. Supp. 3d 60, 63 (D.D.C. 2016) (quoting *Thompson v. Linda & A., Inc.*, 779 F. Supp. 2d 139, 146 (D.D.C. 2011)).  Under the FLSA, courts consider "the totality of the circumstances of the relationship between the [putative] employee and [putative] employer to determine whether the putative employer has the power to hire and fire, supervise and control work schedules or conditions of employment, determine rate and method of pay, and maintain employment records." *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 5 (D.D.C. 2010).  "A party need not establish each element in every case." *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014).  "The dominant theme in the case law is that those who have operating control over employees within companies may be individually liable for FLSA violations committed by the companies." *Id*. (*quoting Martin v. Spring Break '83 Prods., LLC*, 688 F.3d 247, 251 (5th Cir. 2012)).  For purposes of the FLSA, "the definition of employer is to be broadly construed, [and] an employee may have more than one employer under the law." *Partridge v. Am. Hosp. Mgmt. Co., LLC*, 289 F. Supp. 3d 1, 14 (D.D.C. 2017).  This court likewise "constru[es] broadly the definition of 'employer' to serve the remedial purpose of the [WPCL]." *Steinke*, 282 A.3d at 1083; *see also Orozco*, 757 F.3d at 448 ("[T]he remedial purposes of the FLSA require the courts to define

'employer' more broadly than the term would be interpreted in traditional common law applications.") (internal quotation marks omitted).

Consistent with the foregoing, we uphold OAH's determination that Ms. Wright was Ms. Beck's employer as to the work that Ms. Beck performed as an employee. Ms. Wright interviewed and hired Ms. Beck and their contract allowed her, or Ms. Beck, to terminate the contract upon the other party's material breach. As explained above, Ms. Wright retained the power to at least supervise, if not control, Ms. Beck's in-office work schedule and the various conditions of her employment. As to Ms. Beck's rate and method of pay, Ms. Wright set and adjusted Ms. Beck's hourly wage rate. Ms. Wright also chose how she paid Ms. Beck until March of 2018, when Ms. Beck requested payments via Venmo and Ms. Wright obliged. Although Ms. Wright did not maintain employment records because she viewed Ms. Beck as an independent contractor, this factor is not dispositive and does not alter our conclusion that Ms. Wright was Ms. Beck's employer. *Cf. Thompson*, 779 F. Supp. 2d at 152 (concluding that an individual was an employer without discussing whether he maintained employment records).

### III.  Conclusion

For the foregoing reasons, we affirm the OAH Order in part and vacate it in part.  We remand for a redetermination of the damages awards and, as it might be affected, the penalty attributable to petitioners' failure to timely pay Ms. Beck for the (non-social-media) work she performed as an employee of Shea Yeleen, and for any such further proceedings as OAH may deem warranted.

*So ordered.*